**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1457**

KEYSTONE NORTHEAST, INC., f/k/a Pavers Plus GSP, Inc.,
assignee of Madawaska Brick and Block Corp.,

Plaintiff - Appellee,

v.

KEYSTONE RETAINING WALL SYSTEMS, LLC, f/k/a Keystone
Retaining Wall Systems, Inc., a division and wholly owned
subsidiary of Contech Construction Products, LLC, f/k/a
Contech Construction Products, Inc.; CONTECH CONSTRUCTION
PRODUCTS, LLC, f/k/a Contech Construction Products, Inc.,

Defendants - Appellants.

Appeal from the United States District Court for the District of
South Carolina, at Greenville. Bruce H. Hendricks, District
Judge. (6:12-cv-00720-BHH)

Argued: October 25, 2016                Decided: January 18, 2017

Before NIEMEYER and MOTZ, Circuit Judges, and DAVIS, Senior
Circuit Judge.

Affirmed in part, vacated in part, and remanded by unpublished
opinion. Judge Niemeyer wrote the opinion, in which Judge Motz
and Senior Judge Davis joined.

**ARGUED**: Paul Gregory Joyce, COLUCCI & GALLAHER, P.C., Buffalo,
New York, for Appellants. **ON BRIEF**: Thomas E. Vanderbloemen,
GALLIVAN, WHITE & BOYD, P.A., Greenville, South Carolina, for
Appellants.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

Keystone Retaining Wall Systems, LLC ("Keystone Wall Systems"), the designer of a segmental retaining wall system and holder of intellectual property related to that design, entered into a "License Agreement" with Keystone Northeast, Inc., to manufacture and sell the system in Maine, New Hampshire, and the eastern part of Massachusetts. The License Agreement imposed a sales quota on Keystone Northeast, which, if not met, justified immediate termination of the agreement. Otherwise, the agreement's term expired at the end of 2010, subject to year-to-year renewals thereafter upon the establishment of revised performance goals.

During the License Agreement's term, Keystone Wall Systems and Keystone Northeast entered into transfer agreements, which provided for Keystone Northeast's transfer of a portion of the licensed territories back to Keystone Wall Systems, thereby enabling Keystone Wall Systems to deal directly with local manufacturers of the blocks used in the system. The transfer agreements provided for readjustments of performance goals and compensation.

When Keystone Northeast allegedly failed to meet its sales quota for 2008, Keystone Wall Systems terminated the License Agreement, prompting Keystone Northeast to commence this breach of contract action for damages.

2

The district court granted Keystone Northeast summary judgment for damages under the License Agreement for the period from 2008 to 2010, when the agreement expired. It also awarded damages to Keystone Northeast under three transfer agreements for obligations that it found continued after the termination of the License Agreement. Finally, it ordered specific performance of the three transfer agreements, requiring Keystone Wall Systems to pay royalties into the future. From the district court's judgment, Keystone Wall Systems filed this appeal.

Keystone Northeast has not appeared in this appeal. Nonetheless, we affirm the district court's judgment awarding Keystone Northeast damages through 2010, but we vacate its award of damages under the transfer agreements after 2010 and its order of specific performance, and we remand for the recalculation of damages.

I

The License Agreement between Keystone Wall Systems and Keystone Northeast, dated January 2, 1998, gives Keystone Northeast an exclusive license to manufacture and sell Keystone Wall System's designed block system in Maine, New Hampshire, and the eastern part of Massachusetts. The License Agreement fixed an annual sales quota based on the square footage of block "face area" and provided that Keystone Wall Systems could terminate the contract immediately and without notice if Keystone

3

Northeast failed to meet the quota. If not terminated for failure to meet the sales quota or for any other enumerated reason, the Agreement was set to expire at the end of 2010, "with renewals for successive year terms" under newly negotiated sales quotas.

Possessing this exclusive right to manufacture and sell the block system, Keystone Northeast contracted with local manufacturers to produce the blocks in various portions of its licensed territory. These manufacturers included Gagne & Son Concrete Blocks, Inc., in Maine; HiWay Concrete Products Co., Inc., in Massachusetts; and Adolf Jandris & Sons, Inc., in Massachusetts. But, as Keystone Northeast's relationships with those three manufacturers soured, Keystone Northeast sought to transfer back to Keystone Wall Systems portions of its licensed territory to enable Keystone Wall Systems to deal directly with the local manufacturers. As a result, Keystone Wall Systems, Keystone Northeast, and the local manufacturers entered into transfer agreements, which not only transferred territory back to Keystone Wall Systems but also adjusted royalties and quotas and provided for other modifications to the License Agreement.

Keystone Northeast, Keystone Wall Systems, and Gagne entered into the first transfer agreement in December 1999 (the "Gagne Transfer Agreement"). This agreement (1) renewed the License Agreement through December 31, 2003; (2) increased sales

4

quotas that would reach a maximum of 500,000 square feet of block face area in 2003; (3) provided that Gagne's sales in Maine would count toward Keystone Northeast's annual sales quota for purposes of Keystone Northeast's obligations under the License Agreement; (4) provided that Keystone Northeast had the right of first refusal to expand its licensed territory into western Massachusetts before Keystone Wall Systems could accept a third party offer to acquire that territory; and (5) provided that the License Agreement otherwise continued in full force and effect. The agreement also provided that if Keystone Northeast exercised its right of first refusal, 75,000 square feet would be added to its sales quota. To exercise its right, Keystone Northeast was required to match the initial license fee offered by the third party, up to a maximum of $25,000.

Keystone Wall Systems and Keystone Northeast entered into two other similar transfer agreements in 2000, transferring back Keystone Northeast's licensed territory that was served by Jandris and HiWay. Those transfer agreements (1) set out schedules for license-fee sharing between Keystone Northeast and Keystone Wall Systems; (2) provided that Jandris' and HiWay's sales would count toward Keystone Northeast's annual sales quota; (3) added western Massachusetts to Keystone Northeast's licensed territory; and (4) otherwise provided for the continued enforcement of the License Agreement.

5

In September 2005, Keystone Wall Systems and Keystone Northeast renewed the 1998 License Agreement "through December 31, 2010, with no change in the Performance Requirements" and without any other amendment.

From 2005 to 2007, Keystone Northeast was credited with sales of more than 575,000 square feet, meaning that it exceeded its sales quota even if its quota had increased to 575,000 square feet upon exercise of its right of first refusal for western Massachusetts. In 2008, however, Keystone Northeast was credited for only 538,037 square feet, which exceeded its quota if it had not exercised the right of first refusal (500,000 square feet), but fell short of its quota if it had exercised the right of first refusal (575,000 square feet).

By letter dated March 17, 2009, Keystone Wall Systems, taking the position that Keystone Northeast's sales quota had increased to 575,000 square feet, notified Keystone Northeast that it was "terminating the License Agreement . . . effective December 31, 2008," because it failed to meet its quota. The letter stated that, under the Jandris Transfer Agreement, Keystone Northeast had obtained the rights to production in western Massachusetts and therefore had in effect exercised its right of first refusal as specified in the Gagne Transfer Agreement. After termination, Keystone Wall Systems stopped paying Keystone Northeast its share of royalties for sales made

6

by Gagne, Jandris, and HiWay, as specified in the three transfer agreements.

On March 12, 2012, Keystone Northeast commenced this action against Keystone Wall Systems for breach of contract, based on Keystone Wall Systems' termination of the License Agreement and for related torts. After the completion of discovery, Keystone Wall Systems filed a motion for summary judgment on all of Keystone Northeast's claims, and Keystone Northeast filed a cross-motion for summary judgment on its breach of contract claim.

By order dated March 16, 2015, the district court entered partial summary judgment in favor of Keystone Northeast, ruling that it was entitled to judgment on its breach of contract claim because Keystone Northeast had not exercised its right of first refusal under the License Agreement and therefore its quota had remained at 500,000 square feet, a number that it satisfied. The court also ruled that Keystone Northeast was entitled to royalties under the three transfer agreements so long as the License Agreement was in force. Because Keystone Wall Systems "would not have automatically been entitled to terminate the License Agreement at the end of the term in 2010," the court concluded that Keystone Northeast could seek "damages accruing beyond that time." Finally, the court concluded that the three transfer agreements "depend[ed] on the License Agreement," and

7

thus Keystone Northeast "did not have a perpetual right to receive royalties regardless of its compliance with the License Agreement." The court deferred ruling on the amount of damages.

Both parties filed motions for reconsideration, and by order dated March 25, 2015, the district court revised its rulings. First, it reversed its earlier ruling that Keystone Wall Systems would not have unilaterally terminated the License Agreement at the end of its 2010 term, concluding that in fact it would have. Accordingly, the court concluded that Keystone Northeast was entitled to damages for the termination of the License Agreement only from the end of 2008 (the time of the breach) to the end of 2010, and not for any "damages for the future value of the license." Second, the court reversed its earlier ruling that Keystone Northeast was entitled to royalties under the transfer agreements only so long as the License Agreement was in force. It concluded instead that, because Keystone Wall Systems' obligation to pay royalties under the transfer agreements was not dependent on the License Agreement, Keystone Wall Systems had a continuing obligation beyond 2010 to pay Keystone Northeast its share of the royalties.

The next day, the court held a hearing on the damage calculations, and, following the hearing, awarded Keystone Northeast $725,775 in damages, calculated to the date of the court's order, plus $203,140 in prejudgment interest. Because

8

it concluded that the amount of future royalties would be the product of speculation, it ordered specific performance, obligating Keystone Wall Systems to continue paying royalties under the transfer agreements, based on sales in Keystone Northeast's territory.

From the district court's judgment, entered April 1, 2015, Keystone Wall Systems filed this appeal.

II

Keystone Wall Systems contends first that Keystone Northeast in fact exercised its right of first refusal to obtain the western Massachusetts territory and that therefore its quota under the License Agreement increased from 500,000 square feet to 575,000 square feet, a figure that Keystone Northeast did not meet in 2008. It argues that the district court erred in concluding that it breached the License Agreement and therefore that we should reverse the summary judgment entered in favor of Keystone Northeast and grant summary judgment in favor of it.

The question thus presented is whether the record demonstrates that Keystone Northeast indeed exercised the right of first refusal, thereby increasing its quota obligation, as provided in the Gagne Transfer Agreement.

The district court was unable to find sufficient evidence to justify a reasonable jury's finding that Keystone Northeast

9

exercised its right of first refusal. Accordingly, it denied Keystone Wall Systems' motion for summary judgment and granted Keystone Northeast's motion.

Based on our review of the record, we agree with the district court and conclude that, as a matter of law, Keystone Northeast did not exercise its right of first refusal and that therefore Keystone Wall Systems was not justified in terminating the license agreement based on Keystone Northeast's failure to meet its 2008 quota.

The right of first refusal provision in the Gagne Transfer Agreement provides that Keystone Northeast "shall have a first right of refusal to obtain the license to the Western Massachusetts Territory before [Keystone Wall Systems] may accept a third party offer to acquire that license." The provision continues by requiring Northeast, in order to exercise the right, "to match the initial license fee up to a maximum of $25,000.00 and an addition of 75,000 square feet to [Keystone Northeast's] existing quota." Under Minnesota law, which governed the contract, for a right of first refusal to "ripen[] into an option," a third party would have to make a bona fide offer and that offer would have to be communicated to the party holding the right. Dyrdal v. Golden Nuggets, Inc., 689 N.W.2d 779, 784 (Minn. 2004).

Based on our review of the record, we can find no evidence either that a third party made a bona fide offer to Keystone Wall Systems or that Keystone Wall Systems communicated a third-party offer to Keystone Northeast. Keystone Wall Systems argues, nonetheless, that circumstantial evidence supports its position. It maintains that the record shows that Jandris was interested in acquiring Keystone Wall Systems' western Massachusetts territory and that, when the territory was ultimately granted to Keystone Northeast in the Jandris Transfer Agreement, Keystone Northeast and Jandris evenly split payment of the $25,000 license fee. Keystone Wall Systems reasons that there "would have [been] no reason to offer [Keystone Northeast] such an arrangement if the parties had not been exercising the right of first refusal."

This evidence, however, is not evidence that Jandris or any other third party actually made an offer or that a third-party offer was communicated to Keystone Northeast. Indeed, the direct evidence points in the opposite direction. Keystone Northeast's President Dan Albert testified that Keystone Northeast had not exercised its right of first refusal and that it had never received notice of a third-party offer. Consistent with that testimony, Keystone Wall Systems' former President Bill Dawson, who actually signed the Gagne and Jandris Transfer Agreements, testified that he did not recall Keystone Northeast

11

exercising its right of first refusal. To the contrary, he recalled that Keystone Northeast continued to have a 500,000 square feet quota during the period from 2005 to 2008, which was indicative of the fact that Keystone Northeast had never exercised its right of first refusal.

Keystone Wall Systems does point to an affidavit filed in district court in which Keystone Wall Systems' Sales Manager John Schramm stated conclusorily, "As a result of the Plaintiff's right of first refusal, the Plaintiff obtained Superior's territory in Massachusetts as well as Berkshire County, making it the sole licensee in the Commonwealth of Massachusetts." This litigation affidavit, however, points to no evidence to support its bare conclusion. Indeed, Schramm himself explicitly denied such a conclusion in an e-mail that he sent during the relevant period. In response to Keystone Wall Systems' President's inquiry whether Keystone Northeast's quota had indeed increased by 75,000 square feet, as provided in the right of first refusal, Schramm responded, "We gave him the west half of Mass[achusetts] in a later agreement. We had no third party offer that I am aware of."

In light of this record, we agree with the district court that there is no record evidence to support Keystone Wall Systems' contention that Keystone Northeast exercised its right of first refusal over the western Massachusetts territory and

12

thereby increased its quota to 575,000 square feet. Accordingly, Keystone Wall Systems' termination of the license agreement in 2008 constituted a breach of the agreement, for which Keystone Northeast was entitled to damages.

III

It is uncontroverted that the License Agreement's term expired at the end of 2010 and that it was not renewed thereafter. Nonetheless, the district court ruled that the three transfer agreements, each of which modified the License Agreement, constituted separate and independent contracts that imposed independent and continuing obligations on Keystone Wall Systems to pay Keystone Northeast royalties beyond 2010. Accordingly, the court awarded damages for royalties up to the date of its order and specific performance for a payment of royalties in the future.

Keystone Wall Systems contends that the district court also erred in these rulings, as the three transfer agreements were amendments to the License Agreement, and when the License Agreement ended, so did the three transfer agreements. We agree.

In substance, the transfer agreements effected transfers of portions of territory licensed under the License Agreement. Therefore, they would be meaningless without the existence of

13

the underlying License Agreement.  This is made explicit in the terms of the various transfer agreements.  Each begins with the recital that the parties "entered a License Agreement dated January 2, 1998" and that Keystone Northeast and Keystone Wall Systems "desire to accomplish a transfer" of some of Keystone Northeast's rights under that License Agreement.  The parties thus clearly treated the License Agreement as the premise of the transfer agreements.

Again, after the recitals, each agreement makes clear that the transfer agreement transferred a portion of Keystone Northeast's "right, title and interest in and to the License Agreement pertaining to the Transferred Territory to [Keystone Wall Systems] subject to the terms and conditions of this Agreement.  . . . The License Agreement, except to the extent amended by this Agreement, shall continue in full force and effect."  (Emphasis added).

And yet again, the transfer agreements provide that, if the third party license in the transferred territory "is terminated for any reason," Keystone Northeast's "then current License Agreement" would be amended to include the transferred territory.

Finally, apart from the language in the transfer agreements, the parties' extension of the underlying License Agreement in 2005, extending it to 2010, indicates that the

14

parties viewed the transfer agreements simply as amendments to the License Agreement. The renewal agreement refers to "the License Agreement, <u>as amended by the transfer agreements</u>." (Emphasis added).

Because we conclude that the district court erred in holding that the transfer agreements imposed independent and continuing obligations beyond the termination of the License Agreement, we reverse its ruling in that regard. We thus vacate the award of damages and the order of specific performance and remand for the recalculation of damages only through the end of 2010.

IV

Finally, Keystone Wall Systems challenges the district court's calculation of damages during the 2008 to 2010 period. Specifically, it claims that the district court incorrectly assumed that -- after Keystone Wall Systems breached the License Agreement in 2008 -- Keystone Northeast would meet its quota of 500,000 in both 2009 and 2010, as third-party sales data for those years suggests that Keystone Northeast would not have met its quota unless it began manufacturing blocks itself. Keystone Wall Systems concludes, therefore, that the court should not have awarded damages based on royalties and interest for 2009 and 2010. We disagree.

15

In estimating lost profit, a court should not assume that a party is unable to fulfill its end of the bargain. See Williston on Contracts § 64:10 (4th ed. 2002) ("[T]he fact that the plaintiff's damage is uncertain in amount or even that it is uncertain that substantial damage has been caused should not deprive the plaintiff of a right to compensation for the loss of the defendant's performance that would have given the plaintiff a chance to make a profit or avoid damage"). The License Agreement contemplated continued performance until 2010. And because Keystone Northeast had met its 500,000 square feet quota each year preceding Keystone Wall System's purported breach, the district court did not err in assuming that Keystone Northeast would continue to meet that quota for the following two years.

\* \* \*

In sum, we agree with the district court that Keystone Wall Systems breached the License Agreement and that Keystone Northeast was entitled to damages through 2010. But because we find that the transfer agreements depended on the continued existence of the License Agreement, Keystone Wall Systems was not obligated to make royalty payments beyond 2010 when the License Agreement's term ended. We therefore vacate the district court's award of damages and its order of specific

16

performance, and we remand for the recalculation of damages, limiting damages to the period ending December 31, 2010.

IT IS SO ORDERED.